## SHAW ET AL. *v.* RENO, ATTORNEY GENERAL, ET AL.

No. 92–357.   Argued April 20, 1993—Decided June 28, 1993

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. WHITE, J., filed a dissenting opinion, in which BLACKMUN and STEVENS, JJ., joined, *post*, p. 658. BLACKMUN, J., *post*, p. 676, STEVENS, J., *post*, p. 676, and SOUTER, J., *post*, p. 679, filed dissenting opinions.

*Robinson O. Everett* argued the cause for appellants. With him on the briefs was *Jeffrey B. Parsons.*

*H. Jefferson Powell* argued the cause for state appellees. With him on the briefs were *Michael F. Easley*, Attorney General of North Carolina, *Edwin M. Speas, Jr.*, Senior

Deputy Attorney General, and *Norma S. Harrell* and *Tiare B. Smiley*, Special Deputy Attorneys General. *Edwin S. Kneedler* argued the cause for federal appellees. On the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Turner, Thomas G. Hungar,* and *Jessica Dunsay Silver.**

JUSTICE O'CONNOR delivered the opinion of the Court.

This case involves two of the most complex and sensitive issues this Court has faced in recent years: the meaning of the constitutional "right" to vote, and the propriety of race-based state legislation designed to benefit members of historically disadvantaged racial minority groups. As a result of the 1990 census, North Carolina became entitled to a 12th seat in the United States House of Representatives. The General Assembly enacted a reapportionment plan that included one majority-black congressional district. After the Attorney General of the United States objected to the plan pursuant to § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c, the General Assembly passed new legislation creating a second majority-black district. Appellants allege that the revised plan, which contains district boundary lines of dramatically irregular shape, consti-

*Briefs of *amici curiae* urging reversal were filed for the American Jewish Congress by *Marc D. Stern* and *Lois C. Waldman;* for the Republican National Committee by *Benjamin L. Ginsberg* and *Michael A. Hess;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the Democratic National Committee et al. by *Wayne R. Arden* and *Jeffrey M. Wice;* for the Lawyers' Committee for Civil Rights under Law et al. by *Herbert Wachtell, William H. Brown III, Thomas J. Henderson, Frank R. Parker, Brenda Wright, Nicholas DeB. Katzenbach, Michael R. Cole, Alan E. Kraus, Laughlin McDonald, Kathy Wilde, E. Richard Larson,* and *Dennis Courtland Hayes;* for the NAACP Legal Defense and Educational Fund, Inc., by *Elaine R. Jones, Charles Stephen Ralston,* and *Dayna L. Cunningham;* and for Bolley Johnson et al. by *Donald B. Verrilli, Jr., Scott A. Sinder, Kevin X. Crowley,* and *James A. Peters.*

tutes an unconstitutional racial gerrymander. The question before us is whether appellants have stated a cognizable claim.

I

The voting age population of North Carolina is approximately 78% white, 20% black, and 1% Native American; the remaining 1% is predominantly Asian. App. to Brief for Federal Appellees 16a. The black population is relatively dispersed; blacks constitute a majority of the general population in only 5 of the State's 100 counties. Brief for Appellants 57. Geographically, the State divides into three regions: the eastern Coastal Plain, the central Piedmont Plateau, and the western mountains. H. Lefler & A. Newsom, The History of a Southern State: North Carolina 18–22 (3d ed. 1973). The largest concentrations of black citizens live in the Coastal Plain, primarily in the northern part. O. Gade & H. Stillwell, North Carolina: People and Environments 65–68 (1986). The General Assembly's first redistricting plan contained one majority-black district centered in that area of the State.

Forty of North Carolina's one hundred counties are covered by §5 of the Voting Rights Act of 1965, 42 U. S. C. §1973c, which prohibits a jurisdiction subject to its provisions from implementing changes in a "standard, practice, or procedure with respect to voting" without federal authorization, *ibid.* The jurisdiction must obtain either a judgment from the United States District Court for the District of Columbia declaring that the proposed change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or administrative preclearance from the Attorney General. *Ibid.* Because the General Assembly's reapportionment plan affected the covered counties, the parties agree that §5 applied. Tr. of Oral Arg. 14, 27–29. The State chose to submit its plan to the Attorney General for preclearance.

The Attorney General, acting through the Assistant Attorney General for the Civil Rights Division, interposed a formal objection to the General Assembly's plan. The Attorney General specifically objected to the configuration of boundary lines drawn in the south-central to southeastern region of the State. In the Attorney General's view, the General Assembly could have created a second majority-minority district "to give effect to black and Native American voting strength in this area" by using boundary lines "no more irregular than [those] found elsewhere in the proposed plan," but failed to do so for "pretextual reasons." See App. to Brief for Federal Appellees 10a–11a.

Under § 5, the State remained free to seek a declaratory judgment from the District Court for the District of Columbia notwithstanding the Attorney General's objection. It did not do so. Instead, the General Assembly enacted a revised redistricting plan, 1991 N. C. Extra Sess. Laws, ch. 7, that included a second majority-black district. The General Assembly located the second district not in the south-central to southeastern part of the State, but in the north-central region along Interstate 85. See Appendix, *infra.*

The first of the two majority-black districts contained in the revised plan, District 1, is somewhat hook shaped. Centered in the northeast portion of the State, it moves southward until it tapers to a narrow band; then, with finger-like extensions, it reaches far into the southernmost part of the State near the South Carolina border. District 1 has been compared to a "Rorschach ink-blot test," *Shaw* v. *Barr,* 808 F. Supp. 461, 476 (EDNC 1992) (Voorhees, C. J., concurring in part and dissenting in part), and a "bug splattered on a windshield," Wall Street Journal, Feb. 4, 1992, p. A14.

The second majority-black district, District 12, is even more unusually shaped. It is approximately 160 miles long and, for much of its length, no wider than the I–85 corridor. It winds in snakelike fashion through tobacco country, financial centers, and manufacturing areas "until it gobbles in

enough enclaves of black neighborhoods." 808 F. Supp., at 476–477 (Voorhees, C. J., concurring in part and dissenting in part). Northbound and southbound drivers on I–85 sometimes find themselves in separate districts in one county, only to "trade" districts when they enter the next county. Of the 10 counties through which District 12 passes, 5 are cut into 3 different districts; even towns are divided. At one point the district remains contiguous only because it intersects at a single point with two other districts before crossing over them. See Brief for Republican National Committee as *Amicus Curiae* 14–15. One state legislator has remarked that " '[i]f you drove down the interstate with both car doors open, you'd kill most of the people in the district.' " Washington Post, Apr. 20, 1993, p. A4. The district even has inspired poetry: "Ask not for whom the line is drawn; it is drawn to avoid thee." Grofman, Would Vince Lombardi Have Been Right If He Had Said: "When It Comes to Redistricting, Race Isn't Everything, It's the *Only* Thing"?, 14 Cardozo L. Rev. 1237, 1261, n. 96 (1993) (internal quotation marks omitted).

The Attorney General did not object to the General Assembly's revised plan. But numerous North Carolinians did. The North Carolina Republican Party and individual voters brought suit in Federal District Court, alleging that the plan constituted an unconstitutional political gerrymander under *Davis* v. *Bandemer*, 478 U. S. 109 (1986). That claim was dismissed, see *Pope* v. *Blue*, 809 F. Supp. 392 (WDNC), and this Court summarily affirmed, 506 U. S. 801 (1992).

Shortly after the complaint in *Pope* v. *Blue* was filed, appellants instituted the present action in the United States District Court for the Eastern District of North Carolina. Appellants alleged not that the revised plan constituted a political gerrymander, nor that it violated the "one person, one vote" principle, see *Reynolds* v. *Sims*, 377 U. S. 533, 558 (1964), but that the State had created an unconstitutional *racial* gerrymander. Appellants are five residents of Dur-

ham County, North Carolina, all registered to vote in that county. Under the General Assembly's plan, two will vote for congressional representatives in District 12 and three will vote in neighboring District 2. Appellants sued the Governor of North Carolina, the Lieutenant Governor, the Secretary of State, the Speaker of the North Carolina House of Representatives, and members of the North Carolina State Board of Elections (state appellees), together with two federal officials, the Attorney General and the Assistant Attorney General for the Civil Rights Division (federal appellees).

Appellants contended that the General Assembly's revised reapportionment plan violated several provisions of the United States Constitution, including the Fourteenth Amendment. They alleged that the General Assembly deliberately "create[d] two Congressional Districts in which a majority of black voters was concentrated arbitrarily—without regard to any other considerations, such as compactness, contiguousness, geographical boundaries, or political subdivisions" with the purpose "to create Congressional Districts along racial lines" and to assure the election of two black representatives to Congress. App. to Juris. Statement 102a. Appellants sought declaratory and injunctive relief against the state appellees. They sought similar relief against the federal appellees, arguing, alternatively, that the federal appellees had misconstrued the Voting Rights Act or that the Act itself was unconstitutional.

The three-judge District Court granted the federal appellees' motion to dismiss. 808 F. Supp. 461 (EDNC 1992). The court agreed unanimously that it lacked subject matter jurisdiction by reason of § 14(b) of the Voting Rights Act, 42 U. S. C. § 1973*l*(b), which vests the District Court for the District of Columbia with exclusive jurisdiction to issue injunctions against the execution of the Act and to enjoin actions taken by federal officers pursuant thereto. 808 F. Supp., at 466–467; *id.*, at 474 (Voorhees, C. J., concurring

in relevant part). Two judges also concluded that, to the extent appellants challenged the Attorney General's preclearance decisions, their claim was foreclosed by this Court's holding in *Morris* v. *Gressette,* 432 U. S. 491 (1977). 808 F. Supp., at 467.

By a 2-to-1 vote, the District Court also dismissed the complaint against the state appellees. The majority found no support for appellants' contentions that race-based districting is prohibited by Article I, § 4, or Article I, § 2, of the Constitution, or by the Privileges and Immunities Clause of the Fourteenth Amendment. It deemed appellants' claim under the Fifteenth Amendment essentially subsumed within their related claim under the Equal Protection Clause. 808 F. Supp., at 468–469. That claim, the majority concluded, was barred by *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S. 144 (1977) *(UJO).*

The majority first took judicial notice of a fact omitted from appellants' complaint: that appellants are white. It rejected the argument that race-conscious redistricting to benefit minority voters is *per se* unconstitutional. The majority also rejected appellants' claim that North Carolina's reapportionment plan was impermissible. The majority read *UJO* to stand for the proposition that a redistricting scheme violates white voters' rights only if it is "adopted with the purpose and effect of discriminating against white voters . . . on account of their race." 808 F. Supp., at 472. The purposes of favoring minority voters and complying with the Voting Rights Act are not discriminatory in the constitutional sense, the court reasoned, and majority-minority districts have an impermissibly discriminatory effect only when they unfairly dilute or cancel out white voting strength. Because the State's purpose here was to comply with the Voting Rights Act, and because the General Assembly's plan did not lead to proportional underrepresentation of white voters state-

wide, the majority concluded that appellants had failed to state an equal protection claim. *Id.*, at 472–473.

Chief Judge Voorhees agreed that race-conscious redistricting is not *per se* unconstitutional but dissented from the rest of the majority's equal protection analysis. He read JUSTICE WHITE's opinion in *UJO* to authorize race-based reapportionment only when the State employs traditional districting principles such as compactness and contiguity. 808 F. Supp., at 475–477 (opinion concurring in part and dissenting in part). North Carolina's failure to respect these principles, in Judge Voorhees' view, "augur[ed] a constitutionally suspect, and potentially unlawful, intent" sufficient to defeat the state appellees' motion to dismiss. *Id.*, at 477.

We noted probable jurisdiction. 506 U. S. 1019 (1992).

## II

### A

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society . . . ." *Reynolds* v. *Sims*, 377 U. S., at 555. For much of our Nation's history, that right sadly has been denied to many because of race. The Fifteenth Amendment, ratified in 1870 after a bloody Civil War, promised unequivocally that "[t]he right of citizens of the United States to vote" no longer would be "denied or abridged . . . by any State on account of race, color, or previous condition of servitude." U. S. Const., Amdt. 15, § 1.

But "[a] number of states . . . refused to take no for an answer and continued to circumvent the fifteenth amendment's prohibition through the use of both subtle and blunt instruments, perpetuating ugly patterns of pervasive racial discrimination." Blumstein, Defining and Proving Race Discrimination: Perspectives on the Purpose Vs. Results Approach from the Voting Rights Act, 69 Va. L. Rev. 633, 637 (1983). Ostensibly race-neutral devices such as literacy tests with "grandfather" clauses and "good character" provisos were devised to deprive black voters of the franchise.

Another of the weapons in the States' arsenal was the racial gerrymander—"the deliberate and arbitrary distortion of district boundaries . . . for [racial] purposes." *Bandemer*, 478 U. S., at 164 (Powell, J., concurring in part and dissenting in part) (internal quotation marks omitted). In the 1870's, for example, opponents of Reconstruction in Mississippi "concentrated the bulk of the black population in a 'shoe-string' Congressional district running the length of the Mississippi River, leaving five others with white majorities." E. Foner, Reconstruction: America's Unfinished Revolution, 1863–1877, p. 590 (1988). Some 90 years later, Alabama redefined the boundaries of the city of Tuskegee "from a square to an uncouth twenty-eight-sided figure" in a manner that was alleged to exclude black voters, and only black voters, from the city limits. *Gomillion* v. *Lightfoot*, 364 U. S. 339, 340 (1960).

Alabama's exercise in geometry was but one example of the racial discrimination in voting that persisted in parts of this country nearly a century after ratification of the Fifteenth Amendment. See *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309–313 (1966). In some States, registration of eligible black voters ran 50% behind that of whites. *Id.*, at 313. Congress enacted the Voting Rights Act of 1965 as a dramatic and severe response to the situation. The Act proved immediately successful in ensuring racial minorities access to the voting booth; by the early 1970's, the spread between black and white registration in several of the targeted Southern States had fallen to well below 10%. A. Thernstrom, Whose Votes Count? Affirmative Action and Minority Voting Rights 44 (1987).

But it soon became apparent that guaranteeing equal access to the polls would not suffice to root out other racially discriminatory voting practices. Drawing on the "one person, one vote" principle, this Court recognized that "[t]he right to vote can be affected by a *dilution* of voting power as well as by an absolute prohibition on casting a ballot."

*Allen* v. *State Bd. of Elections*, 393 U. S. 544, 569 (1969) (emphasis added). Where members of a racial minority group vote as a cohesive unit, practices such as multimember or at-large electoral systems can reduce or nullify minority voters' ability, as a group, "to elect the candidate of their choice." *Ibid.* Accordingly, the Court held that such schemes violate the Fourteenth Amendment when they are adopted with a discriminatory purpose and have the effect of diluting minority voting strength. See, *e. g., Rogers* v. *Lodge*, 458 U. S. 613, 616–617 (1982); *White* v. *Regester*, 412 U. S. 755, 765–766 (1973). Congress, too, responded to the problem of vote dilution. In 1982, it amended § 2 of the Voting Rights Act to prohibit legislation that *results* in the dilution of a minority group's voting strength, regardless of the legislature's intent. 42 U. S. C. § 1973; see *Thornburg* v. *Gingles*, 478 U. S. 30 (1986) (applying amended § 2 to vote-dilution claim involving multimember districts); see also *Voinovich* v. *Quilter*, 507 U. S. 146, 155 (1993) (single-member districts).

## B

It is against this background that we confront the questions presented here. In our view, the District Court properly dismissed appellants' claims against the federal appellees. Our focus is on appellants' claim that the State engaged in unconstitutional racial gerrymandering. That argument strikes a powerful historical chord: It is unsettling how closely the North Carolina plan resembles the most egregious racial gerrymanders of the past.

An understanding of the nature of appellants' claim is critical to our resolution of the case. In their complaint, appellants did not claim that the General Assembly's reapportionment plan unconstitutionally "diluted" white voting strength. They did not even claim to be white. Rather, appellants' complaint alleged that the deliberate segregation of voters into separate districts on the basis of race violated their constitutional right to participate in a "color-blind"

electoral process.   Complaint ¶ 29, App. to Juris. Statement 89a–90a; see also Brief for Appellants 31–32.

Despite their invocation of the ideal of a "color-blind" Constitution, see *Plessy* v. *Ferguson,* 163 U. S. 537, 559 (1896) (Harlan, J., dissenting), appellants appear to concede that race-conscious redistricting is not always unconstitutional. See Tr. of Oral Arg. 16–19.   That concession is wise: This Court never has held that race-conscious state decision-making is impermissible in *all* circumstances.   What appellants object to is redistricting legislation that is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification.   For the reasons that follow, we conclude that appellants have stated a claim upon which relief can be granted under the Equal Protection Clause.   See Fed. Rule Civ. Proc. 12(b)(6).

### III

### A

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."   U. S. Const., Amdt. 14, § 1.   Its central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race. *Washington* v. *Davis,* 426 U. S. 229, 239 (1976).   Laws that explicitly distinguish between individuals on racial grounds fall within the core of that prohibition.

No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute. See *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 272 (1979).   Accord, *Washington* v. *Seattle School Dist. No. 1,* 458 U. S. 457, 485 (1982).   Express racial classifications are immediately suspect because, "[a]bsent searching judicial inquiry . . . , there is simply no way of determining what classifications are 'benign' or 'remedial' and what classi-

fications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493 (1989) (plurality opinion); *id.*, at 520 (SCALIA, J., concurring in judgment); see also *UJO*, 430 U. S., at 172 (Brennan, J., concurring in part) ("[A] purportedly preferential race assignment may in fact disguise a policy that perpetuates disadvantageous treatment of the plan's supposed beneficiaries").

Classifications of citizens solely on the basis of race "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943). Accord, *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967). They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility. *Croson, supra,* at 493 (plurality opinion); *UJO, supra,* at 173 (Brennan, J., concurring in part) ("[E]ven in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individual's worth or needs"). Accordingly, we have held that the Fourteenth Amendment requires state legislation that expressly distinguishes among citizens because of their race to be narrowly tailored to further a compelling governmental interest. See, *e. g., Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 277–278 (1986) (plurality opinion); *id.*, at 285 (O'CONNOR, J., concurring in part and concurring in judgment).

These principles apply not only to legislation that contains explicit racial distinctions, but also to those "rare" statutes that, although race neutral, are, on their face, "unexplainable on grounds other than race." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977). As we explained in *Feeney:*

> "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only

upon an extraordinary justification. *Brown* v. *Board of Education,* 347 U. S. 483; *McLaughlin* v. *Florida,* 379 U. S. 184. This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Guinn* v. *United States,* 238 U. S. 347; cf. *Lane* v. *Wilson,* 307 U. S. 268; *Gomillion* v. *Lightfoot,* 364 U. S. 339." 442 U. S., at 272.

## B

Appellants contend that redistricting legislation that is so bizarre on its face that it is "unexplainable on grounds other than race," *Arlington Heights, supra,* at 266, demands the same close scrutiny that we give other state laws that classify citizens by race. Our voting rights precedents support that conclusion.

In *Guinn* v. *United States,* 238 U. S. 347 (1915), the Court invalidated under the Fifteenth Amendment a statute that imposed a literacy requirement on voters but contained a "grandfather clause" applicable to individuals and their lineal descendants entitled to vote "on [or prior to] January 1, 1866." *Id.,* at 357 (internal quotation marks omitted). The determinative consideration for the Court was that the law, though ostensibly race neutral, on its face "embod[ied] no exercise of judgment and rest[ed] upon no discernible reason" other than to circumvent the prohibitions of the Fifteenth Amendment. *Id.,* at 363. In other words, the statute was invalid because, on its face, it could not be explained on grounds other than race.

The Court applied the same reasoning to the "uncouth twenty-eight-sided" municipal boundary line at issue in *Gomillion.* Although the statute that redrew the city limits of Tuskegee was race neutral on its face, plaintiffs alleged that its effect was impermissibly to remove from the city virtually all black voters and no white voters. The Court reasoned:

"If these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote." 364 U. S., at 341.

The majority resolved the case under the Fifteenth Amendment. *Id.*, at 342–348. Justice Whittaker, however, concluded that the "unlawful segregation of races of citizens" into different voting districts was cognizable under the Equal Protection Clause. *Id.*, at 349 (concurring opinion). This Court's subsequent reliance on *Gomillion* in other Fourteenth Amendment cases suggests the correctness of Justice Whittaker's view. See, *e. g., Feeney, supra,* at 272; *Whitcomb* v. *Chavis*, 403 U. S. 124, 149 (1971); see also *Mobile* v. *Bolden*, 446 U. S. 55, 86 (1980) (STEVENS, J., concurring in judgment) (*Gomillion*'s holding "is compelled by the Equal Protection Clause"). *Gomillion* thus supports appellants' contention that district lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause regardless of the motivations underlying their adoption.

The Court extended the reasoning of *Gomillion* to congressional districting in *Wright* v. *Rockefeller*, 376 U. S. 52 (1964). At issue in *Wright* were four districts contained in a New York apportionment statute. The plaintiffs alleged that the statute excluded nonwhites from one district and concentrated them in the other three. *Id.*, at 53–54. Every Member of the Court assumed that the plaintiffs' allegation that the statute "segregate[d] eligible voters by race and place of origin" stated a constitutional claim. *Id.*, at 56 (internal quotation marks omitted); *id.*, at 58 (Harlan, J., concurring); *id.*, at 59–62 (Douglas, J., dissenting). The Justices disagreed only as to whether the plaintiffs had carried their burden of proof at trial. The dissenters thought the unusual

shape of the district lines could "be explained only in racial terms." *Id.*, at 59. The majority, however, accepted the District Court's finding that the plaintiffs had failed to establish that the districts were in fact drawn on racial lines. Although the boundary lines were somewhat irregular, the majority reasoned, they were not so bizarre as to permit of no other conclusion. Indeed, because most of the nonwhite voters lived together in one area, it would have been difficult to construct voting districts without concentrations of nonwhite voters. *Id.*, at 56–58.

*Wright* illustrates the difficulty of determining from the face of a single-member districting plan that it purposefully distinguishes between voters on the basis of race. A reapportionment statute typically does not classify persons at all; it classifies tracts of land, or addresses. Moreover, redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination. As *Wright* demonstrates, when members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes. The district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to maintain the integrity of political subdivisions. See *Reynolds*, 377 U. S., at 578 (recognizing these as legitimate state interests).

The difficulty of proof, of course, does not mean that a racial gerrymander, once established, should receive less scrutiny under the Equal Protection Clause than other state legislation classifying citizens by race. Moreover, it seems clear to us that proof sometimes will not be difficult at all. In some exceptional cases, a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be

understood as anything other than an effort to "segregat[e] . . . voters" on the basis of race. *Gomillion, supra,* at 341. *Gomillion,* in which a tortured municipal boundary line was drawn to exclude black voters, was such a case. So, too, would be a case in which a State concentrated a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions. We emphasize that these criteria are important not because they are constitutionally required—they are not, cf. *Gaffney* v. *Cummings,* 412 U. S. 735, 752, n. 18 (1973)—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines. Cf. *Karcher* v. *Daggett,* 462 U. S. 725, 755 (1983) (STEVENS, J., concurring) ("One need not use Justice Stewart's classic definition of obscenity—'I know it when I see it'—as an ultimate standard for judging the constitutionality of a gerrymander to recognize that dramatically irregular shapes may have sufficient probative force to call for an explanation" (footnotes omitted)).

Put differently, we believe that reapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes. See, *e. g., Holland* v. *Illinois,* 493 U. S. 474, 484, n. 2 (1990) ("[A] prosecutor's assumption that a black juror may be presumed to be partial simply because he is black . . . violates the Equal Protection

Clause" (internal quotation marks omitted)); see also *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 630–631 (1991) ("If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury"). By perpetuating such notions, a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract.

The message that such districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy. As Justice Douglas explained in his dissent in *Wright* v. *Rockefeller* nearly 30 years ago:

> "Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. . . . That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense. . . .
>
> .        .        .        .        .
>
> "When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with

the democratic ideal, it should find no footing here."
376 U. S., at 66–67.

For these reasons, we conclude that a plaintiff challenging
a reapportionment statute under the Equal Protection
Clause may state a claim by alleging that the legislation,
though race neutral on its face, rationally cannot be under-
stood as anything other than an effort to separate voters into
different districts on the basis of race, and that the separa-
tion lacks sufficient justification. It is unnecessary for us to
decide whether or how a reapportionment plan that, on its
face, can be explained in nonracial terms successfully could
be challenged. Thus, we express no view as to whether "the
intentional creation of majority-minority districts, without
more," always gives rise to an equal protection claim. *Post*,
at 668 (WHITE, J., dissenting). We hold only that, on the
facts of this case, appellants have stated a claim sufficient to
defeat the state appellees' motion to dismiss.

## C

The dissenters consider the circumstances of this case
"functionally indistinguishable" from multimember district-
ing and at-large voting systems, which are loosely described
as "other varieties of gerrymandering." *Post*, at 671
(WHITE, J., dissenting); see also *post*, at 684 (SOUTER, J., dis-
senting). We have considered the constitutionality of these
practices in other Fourteenth Amendment cases and have
required plaintiffs to demonstrate that the challenged prac-
tice has the purpose and effect of diluting a racial group's
voting strength. See, *e. g.*, *Rogers* v. *Lodge*, 458 U. S. 613
(1982) (at-large system); *Mobile* v. *Bolden*, 446 U. S. 55 (1980)
(same); *White* v. *Regester*, 412 U. S. 755 (1973) (multimember
districts); *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971) (same);
see also *supra*, at 640–641. At-large and multimember
schemes, however, do not classify voters on the basis of race.
Classifying citizens by race, as we have said, threatens spe-

cial harms that are not present in our vote-dilution cases. It therefore warrants different analysis.

JUSTICE SOUTER apparently believes that racial gerrymandering is harmless unless it dilutes a racial group's voting strength. See *post*, at 684 (dissenting opinion). As we have explained, however, reapportionment legislation that cannot be understood as anything other than an effort to classify and separate voters by race injures voters in other ways. It reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole. See *supra*, at 647–649. JUSTICE SOUTER does not adequately explain why these harms are not cognizable under the Fourteenth Amendment.

The dissenters make two other arguments that cannot be reconciled with our precedents. First, they suggest that a racial gerrymander of the sort alleged here is functionally equivalent to gerrymanders for nonracial purposes, such as political gerrymanders. See *post*, at 679 (opinion of STEVENS, J.); see also *post*, at 662–663 (opinion of WHITE, J.). This Court has held political gerrymanders to be justiciable under the Equal Protection Clause. See *Davis* v. *Bandemer*, 478 U. S., at 118–127. But nothing in our case law compels the conclusion that racial and political gerrymanders are subject to precisely the same constitutional scrutiny. In fact, our country's long and persistent history of racial discrimination in voting—as well as our Fourteenth Amendment jurisprudence, which always has reserved the strictest scrutiny for discrimination on the basis of race, see *supra*, at 642–644—would seem to compel the opposite conclusion.

Second, JUSTICE STEVENS argues that racial gerrymandering poses no constitutional difficulties when district lines are drawn to favor the minority, rather than the majority. See *post*, at 678 (dissenting opinion). We have made clear, however, that equal protection analysis "is not dependent

on the race of those burdened or benefited by a particular classification." *Croson,* 488 U. S., at 494 (plurality opinion); see also *id.,* at 520 (SCALIA, J., concurring in judgment). Accord, *Wygant,* 476 U. S., at 273 (plurality opinion). Indeed, racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally. See *Powers* v. *Ohio,* 499 U. S. 400, 410 (1991) ("It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree").

Finally, nothing in the Court's highly fractured decision in *UJO*—on which the District Court almost exclusively relied, and which the dissenters evidently believe controls, see *post,* at 664–667 (opinion of WHITE, J.); *post,* at 684, and n. 6 (opinion of SOUTER, J.)—forecloses the claim we recognize today. *UJO* concerned New York's revision of a reapportionment plan to include additional majority-minority districts in response to the Attorney General's denial of administrative preclearance under § 5. In that regard, it closely resembles the present case. But the cases are critically different in another way. The plaintiffs in *UJO*—members of a Hasidic community split between two districts under New York's revised redistricting plan—did not allege that the plan, on its face, was so highly irregular that it rationally could be understood only as an effort to segregate voters by race. Indeed, the facts of the case would not have supported such a claim. Three Justices approved the New York statute, in part, precisely because it adhered to traditional districting principles:

> "[W]e think it . . . permissible for a State, *employing sound districting principles such as compactness and population equality,* to attempt to prevent racial minorities from being repeatedly outvoted by creating districts that will afford fair representation to the members of those racial groups who are sufficiently numerous *and whose residential patterns afford the opportunity* of creating districts in which they will be in the majority."

430 U. S., at 168 (opinion of WHITE, J., joined by STE-
VENS and REHNQUIST, JJ.) (emphasis added).

As a majority of the Justices construed the complaint, the
*UJO* plaintiffs made a different claim: that the New York
plan impermissibly "diluted" their voting strength. Five of
the eight Justices who participated in the decision resolved
the case under the framework the Court previously had
adopted for vote-dilution cases. Three Justices rejected the
plaintiffs' claim on the grounds that the New York statute
"represented no racial slur or stigma with respect to whites
or any other race" and left white voters with better than
proportional representation. *Id.*, at 165–166. Two others
concluded that the statute did not minimize or cancel out a
minority group's voting strength and that the State's intent
to comply with the Voting Rights Act, as interpreted by the
Department of Justice, "foreclose[d] any finding that [the
State] acted with the invidious purpose of discriminating
against white voters." *Id.*, at 180 (Stewart, J., joined by
Powell, J., concurring in judgment).

The District Court below relied on these portions of *UJO*
to reject appellants' claim. See 808 F. Supp., at 472–473.
In our view, the court used the wrong analysis. *UJO*'s
framework simply does not apply where, as here, a reappor-
tionment plan is alleged to be so irrational on its face that it
immediately offends principles of racial equality. *UJO* set
forth a standard under which white voters can establish
unconstitutional vote dilution. But it did not purport to
overrule *Gomillion* or *Wright*. Nothing in the decision
precludes white voters (or voters of any other race) from
bringing the analytically distinct claim that a reapportion-
ment plan rationally cannot be understood as anything other
than an effort to segregate citizens into separate voting
districts on the basis of race without sufficient justification.
Because appellants here stated such a claim, the District
Court erred in dismissing their complaint.

## IV

JUSTICE SOUTER contends that exacting scrutiny of racial gerrymanders under the Fourteenth Amendment is inappropriate because reapportionment "nearly always require[s] some consideration of race for legitimate reasons." *Post*, at 680 (dissenting opinion). "As long as members of racial groups have [a] commonality of interest" and "racial bloc voting takes place," he argues, "legislators will have to take race into account" in order to comply with the Voting Rights Act. *Ibid.* JUSTICE SOUTER's reasoning is flawed.

Earlier this Term, we unanimously reaffirmed that racial bloc voting and minority-group political cohesion never can be assumed, but specifically must be proved in each case in order to establish that a redistricting plan dilutes minority voting strength in violation of § 2. See *Growe* v. *Emison*, 507 U. S. 25, 40–41 (1993) ("Unless these points are established, there neither has been a wrong nor can be a remedy"). That racial bloc voting or minority political cohesion may be found to exist in *some* cases, of course, is no reason to treat *all* racial gerrymanders differently from other kinds of racial classification. JUSTICE SOUTER apparently views racial gerrymandering of the type presented here as a special category of "benign" racial discrimination that should be subject to relaxed judicial review. Cf. *post*, at 684–685 (dissenting opinion). As we have said, however, the very reason that the Equal Protection Clause demands strict scrutiny of all racial classifications is because without it, a court cannot determine whether or not the discrimination truly is "benign." See *supra*, at 642–643. Thus, if appellants' allegations of a racial gerrymander are not contradicted on remand, the District Court must determine whether the General Assembly's reapportionment plan satisfies strict scrutiny. We therefore consider what that level of scrutiny requires in the reapportionment context.

The state appellees suggest that a covered jurisdiction may have a compelling interest in creating majority-minority

districts in order to comply with the Voting Rights Act. The States certainly have a very strong interest in complying with federal antidiscrimination laws that are constitutionally valid as interpreted and as applied. But in the context of a Fourteenth Amendment challenge, courts must bear in mind the difference between what the law permits and what it requires.

For example, on remand North Carolina might claim that it adopted the revised plan in order to comply with the § 5 "nonretrogression" principle. Under that principle, a proposed voting change cannot be precleared if it will lead to "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U. S. 130, 141 (1976). In *Beer*, we held that a reapportionment plan that created one majority-minority district where none existed before passed muster under § 5 because it improved the position of racial minorities. *Id.*, at 141–142; see also *Richmond* v. *United States*, 422 U. S. 358, 370–371 (1975) (annexation that reduces percentage of blacks in population satisfies § 5 where post-annexation districts "fairly reflect" current black voting strength).

Although the Court concluded that the redistricting scheme at issue in *Beer* was nonretrogressive, it did not hold that the plan, for that reason, was immune from constitutional challenge. The Court expressly declined to reach that question. See 425 U. S., at 142, n. 14. Indeed, the Voting Rights Act and our case law make clear that a reapportionment plan that satisfies § 5 still may be enjoined as unconstitutional. See 42 U. S. C. § 1973c (neither a declaratory judgment by the District Court for the District of Columbia nor preclearance by the Attorney General "shall bar a subsequent action to enjoin enforcement" of new voting practice); *Allen*, 393 U. S., at 549–550 (after preclearance, "private parties may enjoin the enforcement of the new enactment . . . in traditional suits attacking its constitutionality"). Thus,

we do not read *Beer* or any of our other §5 cases to give covered jurisdictions *carte blanche* to engage in racial gerrymandering in the name of nonretrogression. A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression. Our conclusion is supported by the plurality opinion in *UJO*, in which four Justices determined that New York's creation of additional majority-minority districts was constitutional because the plaintiffs had failed to demonstrate that the State "did more than the Attorney General was authorized to *require* it to do under the nonretrogression principle of *Beer*." 430 U. S., at 162–163 (opinion of WHITE, J., joined by Brennan, BLACKMUN, and STEVENS, JJ.) (emphasis added).

Before us, the state appellees contend that the General Assembly's revised plan was necessary not to prevent retrogression, but to avoid dilution of black voting strength in violation of §2, as construed in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986). In *Gingles* the Court considered a multi-member redistricting plan for the North Carolina State Legislature. The Court held that members of a racial minority group claiming §2 vote dilution through the use of multi-member districts must prove three threshold conditions: that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," that the minority group is "politically cohesive," and that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.*, at 50–51. We have indicated that similar preconditions apply in §2 challenges to single-member districts. See *Voinovich* v. *Quilter*, 507 U. S., at 157–158; *Growe* v. *Emison*, 507 U. S., at 40.

Appellants maintain that the General Assembly's revised plan could not have been required by §2. They contend that the State's black population is too dispersed to support two geographically compact majority-black districts, as the bi-

zarre shape of District 12 demonstrates, and that there is no evidence of black political cohesion. They also contend that recent black electoral successes demonstrate the willingness of white voters in North Carolina to vote for black candidates. Appellants point out that blacks currently hold the positions of State Auditor, Speaker of the North Carolina House of Representatives, and chair of the North Carolina State Board of Elections. They also point out that in 1990 a black candidate defeated a white opponent in the Democratic Party runoff for a United States Senate seat before being defeated narrowly by the Republican incumbent in the general election. Appellants further argue that if § 2 did require adoption of North Carolina's revised plan, § 2 is to that extent unconstitutional. These arguments were not developed below, and the issues remain open for consideration on remand.

The state appellees alternatively argue that the General Assembly's plan advanced a compelling interest entirely distinct from the Voting Rights Act. We previously have recognized a significant state interest in eradicating the effects of past racial discrimination. See, e. g., *Croson*, 488 U. S., at 491–493 (opinion of O'CONNOR, J., joined by REHNQUIST, C. J., and WHITE, J.); *id.*, at 518 (KENNEDY, J., concurring in part and concurring in judgment); *Wygant*, 476 U. S., at 280–282 (plurality opinion); *id.*, at 286 (O'CONNOR, J., concurring in part and concurring in judgment). But the State must have a " 'strong basis in evidence for [concluding] that remedial action [is] necessary.' " *Croson, supra,* at 500 (quoting *Wygant, supra,* at 277 (plurality opinion)).

The state appellees submit that two pieces of evidence gave the General Assembly a strong basis for believing that remedial action was warranted here: the Attorney General's imposition of the § 5 preclearance requirement on 40 North Carolina counties, and the *Gingles* District Court's findings of a long history of official racial discrimination in North Carolina's political system and of pervasive racial bloc voting.

The state appellees assert that the deliberate creation of majority-minority districts is the most precise way—indeed the only effective way—to overcome the effects of racially polarized voting. This question also need not be decided at this stage of the litigation. We note, however, that only three Justices in *UJO* were prepared to say that States have a significant interest in minimizing the consequences of racial bloc voting apart from the requirements of the Voting Rights Act. And those three Justices specifically concluded that race-based districting, as a response to racially polarized voting, is constitutionally permissible only when the State "employ[s] sound districting principles," and only when the affected racial group's "residential patterns afford the opportunity of creating districts in which they will be in the majority." 430 U. S., at 167–168 (opinion of WHITE, J., joined by STEVENS and REHNQUIST, JJ.).

## V

Racial classifications of any sort pose the risk of lasting harm to our society. They reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin. Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.

In this case, the Attorney General suggested that North Carolina could have created a reasonably compact second majority-minority district in the south-central to southeastern part of the State. We express no view as to whether appellants successfully could have challenged such a district under the Fourteenth Amendment. We also do not decide

whether appellants' complaint stated a claim under constitutional provisions other than the Fourteenth Amendment. Today we hold only that appellants have stated a claim under the Equal Protection Clause by alleging that the North Carolina General Assembly adopted a reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race, and that the separation lacks sufficient justification. If the allegation of racial gerrymandering remains uncontradicted, the District Court further must determine whether the North Carolina plan is narrowly tailored to further a compelling governmental interest. Accordingly, we reverse the judgment of the District Court and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

[Appendix containing map of North Carolina Congressional Plan follows this page.]

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, dissenting.

The facts of this case mirror those presented in *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S. 144 (1977) *(UJO)*, where the Court rejected a claim that creation of a majority-minority district violated the Constitution, either as a *per se* matter or in light of the circumstances leading to the creation of such a district. Of particular relevance, five of the Justices reasoned that members of the white majority could not plausibly argue that their influence over the political process had been unfairly canceled, see *id.*, at 165–168 (opinion of WHITE, J., joined by REHNQUIST and STEVENS, JJ.), or that such had been the State's intent, see *id.*, at 179–180 (Stewart, J., joined by Powell, J., concurring in judgment). Accordingly, they held that plaintiffs were not entitled to relief under the Constitution's

Equal Protection Clause. On the same reasoning, I would affirm the District Court's dismissal of appellants' claim in this instance.

The Court today chooses not to overrule, but rather to sidestep, *UJO*. It does so by glossing over the striking similarities, focusing on surface differences, most notably the (admittedly unusual) shape of the newly created district, and imagining an entirely new cause of action. Because the holding is limited to such anomalous circumstances, *ante*, at 649, it perhaps will not substantially hamper a State's legitimate efforts to redistrict in favor of racial minorities. Nonetheless, the notion that North Carolina's plan, under which whites remain a voting majority in a disproportionate number of congressional districts, and pursuant to which the State has sent its *first* black representatives since Reconstruction to the United States Congress, might have violated appellants' constitutional rights is both a fiction and a departure from settled equal protection principles. Seeing no good reason to engage in either, I dissent.

## I

### A

The grounds for my disagreement with the majority are simply stated: Appellants have not presented a cognizable claim, because they have not alleged a cognizable injury. To date, we have held that only two types of state voting practices could give rise to a constitutional claim. The first involves direct and outright deprivation of the right to vote, for example by means of a poll tax or literacy test. See, *e. g., Guinn* v. *United States,* 238 U. S. 347 (1915). Plainly, this variety is not implicated by appellants' allegations and need not detain us further. The second type of unconstitutional practice is that which "affects the political strength of various groups," *Mobile* v. *Bolden,* 446 U. S. 55, 83 (1980) (STEVENS, J., concurring in judgment), in violation of the Equal Protection Clause. As for this latter category, we

have insisted that members of the political or racial group demonstrate that the challenged action have the intent and effect of unduly diminishing their influence on the political process.[1]  Although this severe burden has limited the number of successful suits, it was adopted for sound reasons.

The central explanation has to do with the nature of the redistricting process.  As the majority recognizes, "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors."  *Ante*, at 646 (emphasis in original).  "Being aware," in this context, is shorthand for "taking into account," and it hardly can be doubted that legislators routinely engage in the business of making electoral predictions based on group characteristics—racial, ethnic, and the like.

> "[L]ike bloc-voting by race, [the racial composition of geographic area] too is a fact of life, well known to those responsible for drawing electoral district lines.  These lawmakers are quite aware that the districts they create will have a white or a black majority; and with each new district comes the unavoidable choice as to the racial composition of the district."  *Beer* v. *United States*, 425 U. S. 130, 144 (1976) (WHITE, J., dissenting).

As we have said, "it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another."  *Gaffney* v. *Cummings*, 412

---

[1] It has been argued that the required showing of discriminatory effect should be lessened once a plaintiff successfully demonstrates intentional discrimination.  See *Garza* v. *County of Los Angeles*, 918 F. 2d 763, 771 (CA9 1990).  Although I would leave this question for another day, I would note that even then courts have insisted on *"some* showing of injury . . . to assure that the district court can impose a meaningful remedy."  *Ibid.*

U. S. 735, 753 (1973); see also *Mobile* v. *Bolden, supra,* at 86–87 (STEVENS, J., concurring in judgment). Because extirpating such considerations from the redistricting process is unrealistic, the Court has not invalidated all plans that consciously use race, but rather has looked at their impact.

Redistricting plans also reflect group interests and inevitably are conceived with partisan aims in mind. To allow judicial interference whenever this occurs would be to invite constant and unmanageable intrusion. Moreover, a group's power to affect the political process does not automatically dissipate by virtue of an electoral loss. Accordingly, we have asked that an identifiable group demonstrate more than mere lack of success at the polls to make out a successful gerrymandering claim. See, *e. g., White* v. *Regester,* 412 U. S. 755, 765–766 (1973); *Whitcomb* v. *Chavis,* 403 U. S. 124, 153–155 (1971).

With these considerations in mind, we have limited such claims by insisting upon a showing that "the political processes . . . were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *White* v. *Regester, supra,* at 766. Indeed, as a brief survey of decisions illustrates, the Court's gerrymandering cases all carry this theme—that it is not mere suffering at the polls but discrimination in the polity with which the Constitution is concerned.

In *Whitcomb* v. *Chavis,* 403 U. S., at 149, we searched in vain for evidence that black voters "had less opportunity than did other . . . residents to participate in the political processes and to elect legislators of their choice." More generally, we remarked:

"The mere fact that one interest group or another concerned with the outcome of [the district's] elections has found itself outvoted and without legislative seats of its

own provides no basis for invoking constitutional remedies where . . . there is no indication that this segment of the population is being denied access to the political system." *Id.*, at 154–155.

Again, in *White* v. *Regester, supra,* the same criteria were used to uphold the District Court's finding that a redistricting plan was unconstitutional. The "historic and present condition" of the Mexican-American community, *id.*, at 767, a status of cultural and economic marginality, *id.*, at 768, as well as the legislature's unresponsiveness to the group's interests, *id.*, at 768–769, justified the conclusion that Mexican-Americans were "'effectively removed from the political processes,'" and "invidiously excluded . . . from effective participation in political life," *id.*, at 769. Other decisions of this Court adhere to the same standards. See *Rogers* v. *Lodge,* 458 U. S. 613, 624–626 (1982); *Chapman* v. *Meier,* 420 U. S. 1, 17 (1975) (requiring proof that "the group has been denied access to the political process equal to the access of other groups").[2]

I summed up my views on this matter in the plurality opinion in *Davis* v. *Bandemer,* 478 U. S. 109 (1986).[3] Because districting inevitably is the expression of interest group politics, and because "the power to influence the political process is not limited to winning elections," *id.*, at 132,

---

[2] It should be noted that § 2 of the Voting Rights Act forbids any State to impose specified devices or procedures that result in a denial or abridgment of the right to vote on account of race or color. Section 2 also provides that a violation of that prohibition "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b).

[3] Although *Davis* involved political groups, the principles were expressly drawn from the Court's racial gerrymandering cases. See 478 U. S., at 131, n. 12 (plurality opinion).

the question in gerrymandering cases is "whether a particular group has been unconstitutionally denied its chance to effectively influence the political process," *id.*, at 132–133. Thus, "an equal protection violation may be found only where the electoral system *substantially disadvantages certain voters in their opportunity to influence the political process effectively.*" *Id.*, at 133 (emphasis added). By this, I meant that the group must exhibit "strong indicia of lack of political power and the denial of fair representation," so that it could be said that it has "essentially been shut out of the political process." *Id.*, at 139. In short, even assuming that racial (or political) factors were considered in the drawing of district boundaries, a showing of discriminatory effects is a "threshold requirement" in the absence of which there is no equal protection violation, *id.*, at 143, and no need to "reach the question of the state interests . . . served by the particular districts," *id.*, at 142.[4]

To distinguish a claim that alleges that the redistricting scheme has discriminatory intent and effect from one that does not has nothing to do with dividing racial classifications between the "benign" and the malicious—an enterprise which, as the majority notes, the Court has treated with skepticism. See *ante*, at 642–643. Rather, the issue is whether the classification based on race discriminates

---

[4] Although disagreeing with the Court's holding in *Davis* that claims of political gerrymandering are justiciable, see *id.*, at 144 (O'CONNOR, J., concurring in judgment), the author of today's opinion expressed views on racial gerrymandering quite similar to my own:

"[W]here a racial minority group is characterized by 'the traditional indicia of suspectness' and is vulnerable to exclusion from the political process . . . individual voters who belong to that group enjoy some measure of protection against intentional dilution of their group voting strength by means of racial gerrymandering. . . . Even so, *the individual's right is infringed only if the racial minority can prove that it has 'essentially been shut out of the political process.'*" *Id.*, at 151–152 (emphasis added). As explained below, that position cannot be squared with the one taken by the majority in this case.

against *anyone* by denying equal access to the political process. Even Members of the Court least inclined to approve of race-based remedial measures have acknowledged the significance of this factor. See *Fullilove* v. *Klutznick*, 448 U. S. 448, 524–525, n. 3 (1980) (Stewart, J., dissenting) ("No person in *[UJO]* was deprived of his electoral franchise"); *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 304–305 (1978) (Powell, J.) ("*United Jewish Organizations* . . . properly is viewed as a case in which the remedy for an administrative finding of discrimination encompassed measures to improve the previously disadvantaged group's ability to participate, *without excluding individuals belonging to any other group from enjoyment of the relevant opportunity—meaningful participation in the electoral process*") (emphasis added).

## B

The most compelling evidence of the Court's position prior to this day, for it is most directly on point, is *UJO*, 430 U. S. 144 (1977). The Court characterizes the decision as "highly fractured," *ante*, at 651, but that should not detract attention from the rejection by a majority in *UJO* of the claim that the State's intentional creation of majority-minority districts transgressed constitutional norms. As stated above, five Justices were of the view that, absent any contention that the proposed plan was adopted with the intent, or had the effect, of unduly minimizing the white majority's voting strength, the Fourteenth Amendment was not implicated. Writing for three Members of the Court, I justified this conclusion as follows:

"It is true that New York deliberately increased the nonwhite majorities in certain districts in order to enhance the opportunity for election of nonwhite representatives from those districts. Nevertheless, there was no fencing out of the white population from participation in the political processes of the county, and the

plan did not minimize or unfairly cancel out white voting strength." 430 U. S., at 165.

In a similar vein, Justice Stewart was joined by Justice Powell in stating:

> "The petitioners have made no showing that a racial criterion was used as a basis for denying them their right to vote, in contravention of the Fifteenth Amendment. See *Gomillion* v. *Lightfoot*, 364 U. S. 339. They have made no showing that the redistricting scheme was employed as part of a 'contrivance to segregate'; to minimize or cancel out the voting strength of a minority class or interest; or otherwise to impair or burden the opportunity of affected persons to participate in the political process." *Id.*, at 179 (opinion concurring in judgment) (some citations omitted).

Under either formulation, it is irrefutable that appellants in this proceeding likewise have failed to state a claim. As was the case in New York, a number of North Carolina's political subdivisions have interfered with black citizens' meaningful exercise of the franchise and are therefore subject to §§ 4 and 5 of the Voting Rights Act. Cf. *UJO, supra,* at 148. In other words, North Carolina was found by Congress to have " 'resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees' " and therefore "would be likely to engage in 'similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself.' " *McCain* v. *Lybrand*, 465 U. S. 236, 245 (1984) (quoting *South Carolina* v. *Katzenbach*, 383 U. S. 301, 334, 335 (1966)).[5] Like New York, North Carolina failed to prove to

---

[5] In *Thornburg* v. *Gingles*, 478 U. S. 30, 38 (1986), we noted the District Court's findings that "North Carolina had officially discriminated against

the Attorney General's satisfaction that its proposed redistricting had neither the purpose nor the effect of abridging the right to vote on account of race or color. Cf. *UJO, supra,* at 150. The Attorney General's interposition of a § 5 objection "properly is viewed" as "an administrative finding of discrimination" against a racial minority. *Regents of Univ. of Cal.* v. *Bakke, supra,* at 305 (opinion of Powell, J.). Finally, like New York, North Carolina reacted by modifying its plan and creating additional majority-minority districts. Cf. *UJO, supra,* at 151–152.

In light of this background, it strains credulity to suggest that North Carolina's purpose in creating a second majority-minority district was to discriminate against members of the majority group by "impair[ing] or burden[ing their] opportunity . . . to participate in the political process." *Id.,* at 179 (Stewart, J., concurring in judgment). The State has made no mystery of its intent, which was to respond to the Attorney General's objections, see Brief for State Appellees 13–14, by improving the minority group's prospects of electing a candidate of its choice. I doubt that this constitutes a discriminatory purpose as defined in the Court's equal protection cases—*i. e.,* an intent to aggravate "the unequal distribution of electoral power." *Post,* at 678 (STEVENS, J., dissenting). But even assuming that it does, there is no question that appellants have not alleged the requisite discriminatory effects. Whites constitute roughly 76% of the total population and 79% of the voting age population in North Carolina. Yet, under the State's plan, they still constitute a voting majority in 10 (or 83%) of the 12 congressional districts. Though they might be dissatisfied at the prospect of casting a vote for a losing candidate—a lot shared by many, including a disproportionate number of minor-

its black citizens with respect to their exercise of the voting franchise from approximately 1900 to 1970 by employing a poll tax [and] a literacy test."

ity voters—surely they cannot complain of discriminatory treatment.[6]

## II

The majority attempts to distinguish *UJO* by imagining a heretofore unknown type of constitutional claim. In its words, "*UJO* set forth a standard under which white voters can establish unconstitutional vote dilution. . . . Nothing in the decision precludes white voters (or voters of any other race) from bringing the analytically distinct claim that a reapportionment plan rationally cannot be understood as anything other than an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification." *Ante*, at 652. There is no support for this distinction in *UJO*, and no authority in the cases relied on by the Court either. More importantly, the majority's submission does not withstand analysis. The logic of its theory appears to be that race-conscious redistricting that "segregates" by drawing odd-shaped lines is qualitatively different from race-conscious redistricting that affects groups in some other way. The distinction is without foundation.

## A

The essence of the majority's argument is that *UJO* dealt with a claim of vote dilution—which required a specific showing of harm—and that cases such as *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), and *Wright* v. *Rockefeller*, 376 U. S. 52 (1964), dealt with claims of racial segregation—which did not. I read these decisions quite differently. Petitioners'

---

[6] This is not to say that a group that has been afforded roughly proportional representation *never* can make out a claim of unconstitutional discrimination. Such districting might have both the intent and effect of "packing" members of the group so as to deprive them of any influence in other districts. Again, however, the equal protection inquiry should look at the group's overall influence over, and treatment by, elected representatives and the political process as a whole.

claim in *UJO* was that the State had "violated the Fourteenth and Fifteenth Amendments by *deliberately revising its reapportionment plan along racial lines.*" 430 U. S., at 155 (plurality opinion) (emphasis added). They also stated: "'Our argument is . . . that the history of the area demonstrates that there could be—and in fact was—*no reason other than race* to divide the community at this time.'" *Id.,* at 154, n. 14 (quoting Brief for Petitioners, O. T. 1976, No. 75–104, p. 6, n. 6) (emphasis in original). Nor was it ever in doubt that "the State deliberately used race in a purposeful manner." 430 U. S., at 165. In other words, the "analytically distinct claim" the majority discovers today was in plain view and did not carry the day for petitioners. The fact that a demonstration of discriminatory effect was required in that case was not a function of the kind of claim that was made. It was a function of the type of injury upon which the Court insisted.

*Gomillion* is consistent with this view. To begin, the Court's reliance on that case as the font of its novel type of claim is curious. Justice Frankfurter characterized the complaint as alleging a deprivation of the right to vote in violation of the *Fifteenth* Amendment. See 364 U. S., at 341, 346. Regardless whether that description was accurate, see *ante,* at 645, it seriously deflates the precedential value which the majority seeks to ascribe to *Gomillion:* As I see it, the case cannot stand for the proposition that the intentional creation of majority-minority districts, without more, gives rise to an equal protection challenge under the Fourteenth Amendment. But even recast as a Fourteenth Amendment case, *Gomillion* does not assist the majority, for its focus was on the alleged *effect* of the city's action, which was to exclude black voters from the municipality of Tuskegee. As the Court noted, the "inevitable effect of this redefinition of Tuskegee's boundaries" was "to deprive the Negro petitioners discriminatorily of the benefits of residence in Tuskegee." 364 U. S., at 341. Even Justice Whit-

taker's concurrence appears to be premised on the notion that black citizens were being "fenc[ed] out" of municipal benefits. *Id.*, at 349. Subsequent decisions of this Court have similarly interpreted *Gomillion* as turning on the unconstitutional effect of the legislation. See *Palmer* v. *Thompson*, 403 U. S. 217, 225 (1971); *United States* v. *O'Brien*, 391 U. S. 367, 385 (1968). In *Gomillion*, in short, the group that formed the majority at the state level purportedly set out to manipulate city boundaries in order to remove members of the minority, thereby denying them valuable municipal services. No analogous purpose or effect has been alleged in this case.

The only other case invoked by the majority is *Wright* v. *Rockefeller, supra*. *Wright* involved a challenge to a legislative plan that created four districts. In the 17th, 19th, and 20th Districts, whites constituted respectively 94.9%, 71.5%, and 72.5% of the population. 86.3% of the population in the 18th District was classified as nonwhite or Puerto Rican. See *Wright* v. *Rockefeller*, 211 F. Supp. 460, 472 (SDNY 1962) (Murphy, J., dissenting); 376 U. S., at 54. The plaintiffs alleged that the plan was drawn with the intent to segregate voters on the basis of race, in violation of the Fourteenth and Fifteenth Amendments. *Id.*, at 53–54. The Court affirmed the District Court's dismissal of the complaint on the ground that plaintiffs had not met their burden of proving discriminatory intent. See *id.*, at 55, 58. I fail to see how a decision based on a failure to establish discriminatory *intent* can support the inference that it is unnecessary to prove discriminatory *effect*.

*Wright* is relevant only to the extent that it illustrates a proposition with which I have no problem: that a complaint stating that a plan has carved out districts on the basis of race *can*, under certain circumstances, state a claim under the Fourteenth Amendment. To that end, however, there must be an allegation of discriminatory purpose and effect, for the constitutionality of a race-conscious redistricting plan

depends on these twin elements. In *Wright,* for example, the facts might have supported the contention that the districts were intended to, and did in fact, shield the 17th District from any minority influence and "pack" black and Puerto Rican voters in the 18th, thereby invidiously minimizing their voting strength. In other words, the purposeful creation of a majority-minority district could have discriminatory effect if it is achieved by means of "packing"—*i. e.,* overconcentration of minority voters. In the present case, the facts could sustain no such allegation.

### B

Lacking support in any of the Court's precedents, the majority's novel type of claim also makes no sense. As I understand the theory that is put forth, a redistricting plan that uses race to "segregate" voters by drawing "uncouth" lines is harmful in a way that a plan that uses race to distribute voters differently is not, for the former "bears an uncomfortable resemblance to political apartheid." See *ante,* at 647. The distinction is untenable.

Racial gerrymanders come in various shades: At-large voting schemes, see, *e. g., White* v. *Regester,* 412 U. S. 755 (1973); the fragmentation of a minority group among various districts "so that it is a majority in none," *Voinovich* v. *Quilter,* 507 U. S. 146, 153 (1993), otherwise known as "cracking," cf. *Connor* v. *Finch,* 431 U. S. 407, 422 (1977); the "stacking" of "a large minority population concentration . . . with a larger white population," Parker, Racial Gerrymandering and Legislative Reapportionment, in Minority Vote Dilution 85, 92 (C. Davidson ed. 1984); and, finally, the "concentration of [minority voters] into districts where they constitute an excessive majority," *Thornburg* v. *Gingles,* 478 U. S. 30, 46, n. 11 (1986), also called "packing," *Voinovich, supra,* at 153. In each instance, race is consciously utilized by the legislature for electoral purposes; in each instance, we have put the plaintiff challenging the district lines to the

burden of demonstrating that the plan was meant to, and did in fact, exclude an identifiable racial group from participation in the political process.

Not so, apparently, when the districting "segregates" by drawing odd-shaped lines.[7]  In that case, we are told, such proof no longer is needed.  Instead, it is the *State* that must rebut the allegation that race was taken into account, a fact that, together with the legislators' consideration of ethnic, religious, and other group characteristics, I had thought we practically took for granted, see *supra*, at 660.  Part of the explanation for the majority's approach has to do, perhaps, with the emotions stirred by words such as "segregation" and "political apartheid."  But their loose and imprecise use by today's majority has, I fear, led it astray.  See n. 7, *supra*. The consideration of race in "segregation" cases is no different than in other race-conscious districting; from the standpoint of the affected groups, moreover, the line-drawings all act in similar fashion.[8]  A plan that "segregates" being functionally indistinguishable from any of the other varieties of gerrymandering, we should be consistent in what we require from a claimant: proof of discriminatory purpose and effect.

The other part of the majority's explanation of its holding is related to its simultaneous discomfort and fascination with irregularly shaped districts.  Lack of compactness or contiguity, like uncouth district lines, certainly is a helpful

---

[7] I borrow the term "segregate" from the majority, but, given its historical connotation, believe that its use is ill advised.  Nor is it a particularly accurate description of what has occurred.  The majority-minority district that is at the center of the controversy is, according to the State, 54.71% African-American.  Brief for State Appellees 5, n. 6.  Even if racial distribution was a factor, no racial group can be said to have been "segregated"—*i. e.*, "set apart" or "isolate[d]."  Webster's Collegiate Dictionary 1063 (9th ed. 1983).

[8] The black plaintiffs in *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), I am confident, would have suffered equally had whites in Tuskegee sought to maintain their control by annexing predominantly white suburbs, rather than splitting the municipality in two.

indicator that some form of gerrymandering (racial or other) might have taken place and that "something may be amiss." *Karcher* v. *Daggett*, 462 U. S. 725, 758 (1983) (STEVENS, J., concurring).   Cf. *Connor, supra,* at 425.   Disregard for geographic divisions and compactness often goes hand in hand with partisan gerrymandering.   See *Karcher, supra,* at 776 (WHITE, J., dissenting); *Wells* v. *Rockefeller,* 394 U. S. 542, 554 (1969) (WHITE, J., dissenting).

But while district irregularities may provide strong indicia of a potential gerrymander, they do no more than that.   In particular, they have no bearing on whether the plan ultimately is found to violate the Constitution.   Given two districts drawn on similar, race-based grounds, the one does not become more injurious than the other simply by virtue of being snakelike, at least so far as the Constitution is concerned and absent any evidence of differential racial impact. The majority's contrary view is perplexing in light of its concession that "compactness or attractiveness has never been held to constitute an independent federal constitutional requirement for state legislative districts." *Gaffney,* 412 U. S., at 752, n. 18; see *ante,* at 647.   It is shortsighted as well, for a regularly shaped district can just as effectively effectuate racially discriminatory gerrymandering as an odd-shaped one.[9]   By focusing on looks rather than impact, the majority "immediately casts attention in the wrong direction—toward superficialities of shape and size, rather than toward the political realities of district composition." R. Dixon, Democratic Representation: Reapportionment in Law and Politics 459 (1968).

---

[9] As has been remarked, "[d]ragons, bacon strips, dumbbells and other strained shapes are not always reliable signs that partisan (or racial or ethnic or factional) interests are being served, while the most regularly drawn district may turn out to have been skillfully constructed with an intent to aid one party."   Sickels, Dragons, Bacon Strips, and Dumbbells—Who's Afraid of Reapportionment?, 75 Yale L. J. 1300 (1966).

Limited by its own terms to cases involving unusually shaped districts, the Court's approach nonetheless will unnecessarily hinder to some extent a State's voluntary effort to ensure a modicum of minority representation. This will be true in areas where the minority population is geographically dispersed. It also will be true where the minority population is not scattered but, for reasons unrelated to race—for example incumbency protection—the State would rather not create the majority-minority district in its most "obvious" location.[10] When, as is the case here, the creation of

---

[10] This appears to be what has occurred in this instance. In providing the reasons for the objection, the Attorney General noted that "[f]or the south-central to southeast area, there were several plans drawn providing for a second majority-minority congressional district" and that such a district would have been no more irregular than others in the State's plan. See App. to Brief for Federal Appellees 10a. North Carolina's decision to create a majority-minority district can be explained as an attempt to meet this objection. Its decision not to create the more compact southern majority-minority district that was suggested, on the other hand, was more likely a result of partisan considerations. Indeed, in a suit brought prior to this one, different plaintiffs charged that District 12 was "grossly contorted" and had "no logical explanation other than incumbency protection and the enhancement of Democratic partisan interests. . . . The plan . . . ignores the directive of the [Department of Justice] to create a minority district in the southeastern portion of North Carolina since any such district would jeopardize the reelection of . . . the Democratic incumbent." App. to Juris. Statement, O. T. 1991, No. 91–2038, p. 43a (Complaint in *Pope* v. *Blue*, No. 3:92CV71–P (WDNC)). With respect to this incident, one writer has observed that "understanding why the configurations are shaped as they are requires us to know at least as much about the interests of incumbent Democratic politicians, as it does knowledge of the Voting Rights Act." Grofman, Would Vince Lombardi Have Been Right If He Had Said: "When It Comes to Redistricting, Race Isn't Everything, It's the *Only* Thing"?, 14 Cardozo L. Rev. 1237, 1258 (1993). The District Court in *Pope* dismissed appellants' claim, reasoning in part that "plaintiffs do not allege, nor can they, that the state's redistricting plan has caused them to be 'shut out of the political process.'" *Pope* v. *Blue*, 809 F. Supp. 392, 397 (WDNC 1992). We summarily affirmed that decision. 506 U. S. 801 (1992).

a majority-minority district does not unfairly minimize the voting power of any other group, the Constitution does not justify, much less mandate, such obstruction. We said as much in *Gaffney:*

> "[C]ourts have [no] constitutional warrant to invalidate a state plan, otherwise within tolerable population limits, because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, provide a rough sort of proportional representation in the legislative halls of the State." 412 U. S., at 754.

## III

Although I disagree with the holding that appellants' claim is cognizable, the Court's discussion of the level of scrutiny it requires warrants a few comments. I have no doubt that a State's compliance with the Voting Rights Act clearly constitutes a compelling interest. Cf. *UJO,* 430 U. S., at 162–165 (opinion of WHITE, J.); *id.,* at 175–179 (Brennan, J., concurring in part); *id.,* at 180 (Stewart, J., concurring in judgment). Here, the Attorney General objected to the State's plan on the ground that it failed to draw a second majority-minority district for what appeared to be pretextual reasons. Rather than challenge this conclusion, North Carolina chose to draw the second district. As *UJO* held, a State is entitled to take such action. See also *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S. 267, 291 (O'CONNOR, J., concurring in part and concurring in judgment).

The Court, while seemingly agreeing with this position, warns that the State's redistricting effort must be "narrowly tailored" to further its interest in complying with the law. *Ante,* at 658. It is evident to me, however, that what North Carolina did was precisely tailored to meet the objection of the Attorney General to its prior plan. Hence, I see no need

for a remand at all, even accepting the majority's basic approach to this case.

Furthermore, how it intends to manage this standard, I do not know. Is it more "narrowly tailored" to create an irregular majority-minority district as opposed to one that is compact but harms other state interests such as incumbency protection or the representation of rural interests? Of the following two options—creation of two minority influence districts or of a single majority-minority district—is one "narrowly tailored" and the other not? Once the Attorney General has found that a proposed redistricting change violates § 5's nonretrogression principle in that it will abridge a racial minority's right to vote, does "narrow tailoring" mean that the most the State can do is preserve the status quo? Or can it maintain that change, while attempting to enhance minority voting power in some other manner? This small sample only begins to scratch the surface of the problems raised by the majority's test. But it suffices to illustrate the unworkability of a standard that is divorced from any measure of constitutional harm. In that, state efforts to remedy minority vote dilution are wholly unlike what typically has been labeled "affirmative action." To the extent that no other racial group is injured, remedying a Voting Rights Act violation does not involve preferential treatment. Cf. *Wygant, supra,* at 295 (WHITE, J., concurring in judgment). It involves, instead, an attempt to *equalize* treatment, and to provide minority voters with an effective voice in the political process. The Equal Protection Clause of the Constitution, surely, does not stand in the way.

## IV

Since I do not agree that appellants alleged an equal protection violation and because the Court of Appeals faithfully followed the Court's prior cases, I dissent and would affirm the judgment below.

JUSTICE BLACKMUN, dissenting.

I join JUSTICE WHITE's dissenting opinion. I did not join Part IV of his opinion in *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S. 144 (1977), because I felt that its "additional argument," *id.,* at 165, was not necessary to decide that case. I nevertheless agree that the conscious use of race in redistricting does not violate the Equal Protection Clause unless the effect of the redistricting plan is to deny a particular group equal access to the political process or to minimize its voting strength unduly. See, *e. g., Chapman* v. *Meier,* 420 U. S. 1, 17 (1975); *White* v. *Regester,* 412 U. S. 755, 765–766 (1973). It is particularly ironic that the case in which today's majority chooses to abandon settled law and to recognize for the first time this "analytically distinct" constitutional claim, *ante,* at 652, is a challenge by white voters to the plan under which North Carolina has sent black representatives to Congress for the first time since Reconstruction. I dissent.

JUSTICE STEVENS, dissenting.

For the reasons stated by JUSTICE WHITE, the decision of the District Court should be affirmed. I add these comments to emphasize that the two critical facts in this case are undisputed: First, the shape of District 12 is so bizarre that it must have been drawn for the purpose of either advantaging or disadvantaging a cognizable group of voters; and, second, regardless of that shape, it *was* drawn for the purpose of facilitating the election of a second black representative from North Carolina.

These unarguable facts, which the Court devotes most of its opinion to proving, give rise to three constitutional questions: Does the Constitution impose a requirement of contiguity or compactness on how the States may draw their electoral districts? Does the Equal Protection Clause prevent a State from drawing district boundaries for the purpose of

facilitating the election of a member of an identifiable group of voters? And, finally, if the answer to the second question is generally "No," should it be different when the favored group is defined by race? Since I have already written at length about these questions,[1] my negative answer to each can be briefly explained.

The first question is easy. There is no independent constitutional requirement of compactness or contiguity, and the Court's opinion (despite its many references to the shape of District 12, see *ante*, at 635–636, 641, 642, 644–648) does not suggest otherwise. The existence of bizarre and uncouth district boundaries is powerful evidence of an ulterior purpose behind the shaping of those boundaries—usually a purpose to advantage the political party in control of the districting process. Such evidence will always be useful in cases that lack other evidence of invidious intent. In this case, however, we know what the legislators' purpose was: The North Carolina Legislature drew District 12 to include a majority of African-American voters. See *ante*, at 634–635. Evidence of the district's shape is therefore convincing, but it is also cumulative, and, for our purposes, irrelevant.

As for the second question, I believe that the Equal Protection Clause is violated when the State creates the kind of uncouth district boundaries seen in *Karcher* v. *Daggett*, 462 U. S. 725 (1983), *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), and this case, for the sole purpose of making it more difficult for members of a minority group to win an election.[2] The

---

[1] See *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 848–852 (CA7) (Stevens, J., dissenting), cert. denied, 409 U. S. 893 (1972); *Mobile* v. *Bolden*, 446 U. S. 55, 83–94 (1980) (STEVENS, J., concurring in judgment); *Karcher* v. *Daggett*, 462 U. S. 725, 744–765 (1983) (STEVENS, J., concurring); see also *Davis* v. *Bandemer*, 478 U. S. 109, 161–185 (1986) (Powell, J., joined by STEVENS, J., concurring in part and dissenting in part).

[2] See *Karcher*, 462 U. S., at 748 (STEVENS, J., concurring) ("If they serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of

duty to govern impartially is abused when a group with power over the electoral process defines electoral boundaries solely to enhance its own political strength at the expense of any weaker group. That duty, however, is not violated when the majority acts to facilitate the election of a member of a group that lacks such power because it remains underrepresented in the state legislature—whether that group is defined by political affiliation, by common economic interests, or by religious, ethnic, or racial characteristics. The difference between constitutional and unconstitutional gerrymanders has nothing to do with whether they are based on assumptions about the groups they affect, but whether their purpose is to enhance the power of the group in control of the districting process at the expense of any minority group, and thereby to strengthen the unequal distribution of electoral power. When an assumption that people in a particular minority group (whether they are defined by the political party, religion, ethnic group, or race to which they belong) will vote in a particular way is used to *benefit* that group, no constitutional violation occurs. Politicians have always relied on assumptions that people in particular groups are likely to vote in a particular way when they draw new district lines, and I cannot believe that anything in today's opinion will stop them from doing so in the future.[3]

---

the community, they violate the constitutional guarantee of equal protection"); *Davis* v. *Bandemer*, 478 U. S., at 178–183, and nn. 21–24 (Powell, J., joined by STEVENS, J., concurring in part and dissenting in part) (describing "grotesque gerrymandering" and "unusual shapes" drawn solely to deprive Democratic voters of electoral power).

[3] The majority does not acknowledge that we *require* such a showing from plaintiffs who bring a vote dilution claim under § 2 of the Voting Rights Act. Under the three-part test established by *Thornburg* v. *Gingles*, 478 U. S. 30, 50–51 (1986), a minority group must show that it could constitute the majority in a single-member district, "that it is politically cohesive," and "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." At least

Finally, we must ask whether otherwise permissible redistricting to benefit an underrepresented minority group becomes impermissible when the minority group is defined by its race. The Court today answers this question in the affirmative, and its answer is wrong. If it is permissible to draw boundaries to provide adequate representation for rural voters, for union members, for Hasidic Jews, for Polish Americans, or for Republicans, it necessarily follows that it is permissible to do the same thing for members of the very minority group whose history in the United States gave birth to the Equal Protection Clause. See, *e. g.*, *ante*, at 639–641.[4] A contrary conclusion could only be described as perverse.

Accordingly, I respectfully dissent.

JUSTICE SOUTER, dissenting.

Today, the Court recognizes a new cause of action under which a State's electoral redistricting plan that includes a configuration "so bizarre," *ante*, at 644, that it "rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race [without] sufficient justification," *ante*, at 649, will be subjected to strict scrutiny. In my view there is no justification for the

---

the latter two of these three conditions depend on proving that what the Court today brands as "impermissible racial stereotypes," *ante*, at 647, are true. Because *Gingles* involved North Carolina, which the Court admits has earlier established the existence of "pervasive racial bloc voting," *ante*, at 656, its citizens and legislators—as well as those from other States—will no doubt be confused by the Court's requirement of evidence in one type of case that the Constitution now prevents reliance on in another. The Court offers them no explanation of this paradox.

[4] The Court's opinion suggests that African-Americans may now be the only group to which it is unconstitutional to offer specific benefits from redistricting. Not very long ago, of course, it was argued that minority groups defined by race were the only groups the Equal Protection Clause *protected* in this context. See *Mobile* v. *Bolden*, 446 U. S., at 86–90, and nn. 6–10 (STEVENS, J., concurring in judgment).

Court's determination to depart from our prior decisions by carving out this narrow group of cases for strict scrutiny in place of the review customarily applied in cases dealing with discrimination in electoral districting on the basis of race.

I

Until today, the Court has analyzed equal protection claims involving race in electoral districting differently from equal protection claims involving other forms of governmental conduct, and before turning to the different regimes of analysis it will be useful to set out the relevant respects in which such districting differs from the characteristic circumstances in which a State might otherwise consciously consider race. Unlike other contexts in which we have addressed the State's conscious use of race, see, *e. g., Richmond* v. *J. A. Croson Co.,* 488 U. S. 469 (1989) (city contracting); *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S. 267 (1986) (teacher layoffs), electoral districting calls for decisions that nearly always require some consideration of race for legitimate reasons where there is a racially mixed population. As long as members of racial groups have the commonality of interest implicit in our ability to talk about concepts like "minority voting strength," and "dilution of minority votes," cf. *Thornburg* v. *Gingles,* 478 U. S. 30, 46–51 (1986), and as long as racial bloc voting takes place,[1] legislators will have to take race into account in order to avoid dilution of minority voting strength in the districting plans they adopt.[2] One need look

---

[1] "Bloc racial voting is an unfortunate phenomenon, but we are repeatedly faced with the findings of knowledgeable district courts that it is a fact of life. Where it exists, most often the result is that neither white nor black can be elected from a district in which his race is in the minority." *Beer* v. *United States,* 425 U. S. 130, 144 (1976) (WHITE, J., dissenting).

[2] Recognition of actual commonality of interest and racially polarized bloc voting cannot be equated with the " 'invocation of race stereotypes' " described by the Court, *ante,* at 648 (quoting *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614, 630–631 (1991)), and forbidden by our case law.

no further than the Voting Rights Act to understand that this may be required, and we have held that race may constitutionally be taken into account in order to comply with that Act. *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S. 144, 161–162 (1977) *(UJO)* (plurality opinion of WHITE, J., joined by Brennan, BLACKMUN, and STEVENS, JJ.); *id.,* at 180, and n. (Stewart, J., joined by Powell, J., concurring in judgment).[3]

A second distinction between districting and most other governmental decisions in which race has figured is that those other decisions using racial criteria characteristically occur in circumstances in which the use of race to the advantage of one person is necessarily at the obvious expense of a member of a different race. Thus, for example, awarding government contracts on a racial basis excludes certain firms from competition on racial grounds. See *Richmond* v. *J. A. Croson Co., supra,* at 493; see also *Fullilove* v. *Klutznick,* 448 U. S. 448, 484 (1980) (opinion of Burger, C. J.). And when race is used to supplant seniority in layoffs, someone is laid off who would not be otherwise. *Wygant* v. *Jackson Bd. of Ed., supra,* at 282–283 (plurality opinion). The same principle pertains in nondistricting aspects of voting law, where race-based discrimination places the disfavored voters at the disadvantage of exclusion from the franchise without any alternative benefit. See, *e. g., Gomillion* v. *Lightfoot,* 364 U. S. 339, 341 (1960) (voters alleged to have been excluded from voting in the municipality).

In districting, by contrast, the mere placement of an individual in one district instead of another denies no one a right

---

[3] Section 5 of the Voting Rights Act requires a covered jurisdiction to demonstrate either to the Attorney General or to the District Court that each new districting plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race[,] color, or [membership in a language minority.]" 42 U. S. C. § 1973c; see also § 1973b(f)(2). Section 2 of the Voting Rights Act forbids districting plans that will have a discriminatory effect on minority groups. § 1973.

or benefit provided to others.[4]   All citizens may register, vote, and be represented.   In whatever district, the individual voter has a right to vote in each election, and the election will result in the voter's representation.   As we have held, one's constitutional rights are not violated merely because the candidate one supports loses the election or because a group (including a racial group) to which one belongs winds up with a representative from outside that group.   See *Whitcomb* v. *Chavis*, 403 U. S. 124, 153–155 (1971).   It is true, of course, that one's vote may be more or less effective depending on the interests of the other individuals who are in one's district, and our cases recognize the reality that members of the same race often have shared interests.   "Dilution" thus refers to the effects of districting decisions not on an individual's political power viewed in isolation, but on the political power of a group.   See *UJO, supra,* at 165 (plurality opinion).   This is the reason that the placement of given voters in a given district, even on the basis of race, does not, without more, diminish the effectiveness of the individual as a voter.

## II

Our different approaches to equal protection in electoral districting and nondistricting cases reflect these differences. There is a characteristic coincidence of disadvantageous effect and illegitimate purpose associated with the State's use of race in those situations in which it has immediately trig-

---

[4] The majority's use of "segregation" to describe the effect of districting here may suggest that it carries effects comparable to school segregation making it subject to like scrutiny.   But a principal consequence of school segregation was inequality in educational opportunity provided, whereas use of race (or any other group characteristic) in districting does not, without more, deny equality of political participation.   *Brown* v. *Board of Education,* 347 U. S. 483, 495 (1954).   And while *Bolling* v. *Sharpe,* 347 U. S. 497, 500 (1954), held that requiring segregation in public education served no legitimate public purpose, consideration of race may be constitutionally appropriate in electoral districting decisions in racially mixed political units.   See *supra,* at 680–681.

gered at least heightened scrutiny (which every Member of the Court to address the issue has agreed must be applied even to race-based classifications designed to serve some permissible state interest).[5]   Presumably because the legitimate consideration of race in a districting decision is usually inevitable under the Voting Rights Act when communities are racially mixed, however, and because, without more, it does not result in diminished political effectiveness for anyone, we have not taken the approach of applying the usual standard of such heightened "scrutiny" to race-based districting decisions.   To be sure, as the Court says, it would be logically possible to apply strict scrutiny to these cases (and to uphold those uses of race that are permissible), see *ante*, at 653–657.   But just because there frequently will be a constitutionally permissible use of race in electoral districting, as exemplified by the consideration of race to comply with the Voting Rights Act (quite apart from the consideration of race to remedy a violation of the Act or the Consti-

---

[5] See *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493–495 (1989) (plurality opinion of O'CONNOR, J., joined by REHNQUIST, C. J., and WHITE and KENNEDY, JJ.) (referring variously to "strict scrutiny," "the standard of review employed in *Wygant*," and "heightened scrutiny"); *id.*, at 520 (SCALIA, J., concurring in judgment) ("strict scrutiny"); *id.*, at 535 (Marshall, J., dissenting) (classifications " 'must serve important governmental objectives and must be substantially related to achievement of those objectives' " (quoting *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 359 (1978) (Brennan, WHITE, Marshall, and BLACKMUN, JJ., concurring in judgment in part and dissenting in part)); 488 U. S., at 514–516 (STEVENS, J., concurring in part and concurring in judgment) (undertaking close examination of the characteristics of the advantaged and disadvantaged racial groups said to justify the disparate treatment although declining to articulate different standards of review); see also *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 279–280 (1986) (plurality opinion of Powell, J.) (equating various articulations of standards of review "more stringent" than " 'reasonableness' " with "strict scrutiny").   Of course the Court has not held that the disadvantaging effect of these uses of race can never be justified by a sufficiently close relationship to a sufficiently strong state interest.   See, *e. g.*, *Croson, supra*, at 509 (plurality opinion).

tution), it has seemed more appropriate for the Court to identify impermissible uses by describing particular effects sufficiently serious to justify recognition under the Fourteenth Amendment. Under our cases there is in general a requirement that in order to obtain relief under the Fourteenth Amendment, the purpose and effect of the districting must be to devalue the effectiveness of a voter compared to what, as a group member, he would otherwise be able to enjoy. See *UJO*, 430 U. S., at 165–166 (plurality opinion of WHITE, J., joined by STEVENS and REHNQUIST, JJ.); *id.*, at 179–180 (Stewart, J., joined by Powell, J., concurring in judgment). JUSTICE WHITE describes the formulations we have used and the common categories of dilutive practice in his dissenting opinion. See *ante*, at 661–663, 669–670.[6]

A consequence of this categorical approach is the absence of any need for further searching "scrutiny" once it has been shown that a given districting decision has a purpose and effect falling within one of those categories. If a cognizable harm like dilution or the abridgment of the right to participate in the electoral process is shown, the districting plan violates the Fourteenth Amendment. If not, it does not. Under this approach, in the absence of an allegation of such cognizable harm, there is no need for further scrutiny because a gerrymandering claim cannot be proven without the element of harm. Nor if dilution is proven is there any need for further constitutional scrutiny; there has never been a suggestion that such use of race could be justified under any type of scrutiny, since the dilution of the right to vote can not be said to serve any legitimate governmental purpose.

There is thus no theoretical inconsistency in having two distinct approaches to equal protection analysis, one for

---

[6] In this regard, I agree with JUSTICE WHITE's assessment of the difficulty the white plaintiffs would have here in showing that their opportunity to participate equally in North Carolina's electoral process has been unconstitutionally diminished. See *ante*, at 666–667, and n. 6 (dissenting opinion).

cases of electoral districting and one for most other types of state governmental decisions. Nor, because of the distinctions between the two categories, is there any risk that Fourteenth Amendment districting law as such will be taken to imply anything for purposes of general Fourteenth Amendment scrutiny about "benign" racial discrimination, or about group entitlement as distinct from individual protection, or about the appropriateness of strict or other heightened scrutiny.[7]

## III

The Court appears to accept this, and it does not purport to disturb the law of vote dilution in any way. See *ante*, at 652 (acknowledging that "*UJO* set forth a standard under which white voters can establish unconstitutional vote dilution"). Instead, the Court creates a new "analytically distinct," *ibid.*, cause of action, the principal element of which is that a districting plan be "so bizarre on its face," *ante*, at 644, or "irrational on its face," *ante*, at 652, or "extremely irregular on its face," *ante*, at 642, that it "rationally cannot be understood as anything other than an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification," *ante*, at 652. Pleading such an element, the Court holds, suffices without a further allegation of harm, to state a claim upon which relief can be granted under the Fourteenth Amendment. See *ante*, at 649.

It may be that the terms for pleading this cause of action will be met so rarely that this case will wind up an aberra-

---

[7] The Court accuses me of treating the use of race in electoral redistricting as a "benign" form of discrimination. *Ante*, at 653. What I am saying is that in electoral districting there frequently are permissible uses of race, such as its use to comply with the Voting Rights Act, as well as impermissible ones. In determining whether a use of race is permissible in cases in which there is a bizarrely shaped district, we can readily look to its effects, just as we would in evaluating any other electoral districting scheme.

tion. The shape of the district at issue in this case is indeed so bizarre that few other examples are ever likely to carry the unequivocal implication of impermissible use of race that the Court finds here. It may therefore be that few electoral districting cases are ever likely to employ the strict scrutiny the Court holds to be applicable on remand if appellants' allegations are "not contradicted." *Ante*, at 653; see also *ante*, at 658.[8]

Nonetheless, in those cases where this cause of action is sufficiently pleaded, the State will have to justify its decision to consider race as being required by a compelling state interest, and its use of race as narrowly tailored to that interest. Meanwhile, in other districting cases, specific consequential harm will still need to be pleaded and proven, in the absence of which the use of race may be invalidated only if it is shown to serve no legitimate state purpose. Cf. *Bolling* v. *Sharpe*, 347 U. S. 497, 500 (1954).

The Court offers no adequate justification for treating the narrow category of bizarrely shaped district claims differently from other districting claims.[9] The only justification I

---

[8] While the Court "express[es] no view as to whether 'the intentional creation of majority-minority districts, without more,' always gives rise to an equal protection claim," *ante*, at 649 (quoting *ante*, at 668 (WHITE, J., dissenting)), it repeatedly emphasizes that there is some reason to believe that a configuration devised with reference to traditional districting principles would present a case falling outside the cause of action recognized today. See *ante*, at 642, 649, 652, 657–658.

[9] The Court says its new cause of action is justified by what I understand to be some ingredients of stigmatic harm, see *ante*, at 647–648, and by a "threa[t] to . . . our system of representative democracy," *ante*, at 650, both caused by the mere adoption of a districting plan with the elements I have described in the text, *supra*, at 685. To begin with, the complaint nowhere alleges any type of stigmatic harm. See App. to Juris. Statement 67a–100a (Complaint and Motion for Preliminary Injunction and For Temporary Restraining Order). Putting that to one side, it seems utterly implausible to me to presume, as the Court does, that North Carolina's creation of this strangely shaped majority-minority district "generates" within the white plaintiffs here anything comparable to "a feeling of inferi-

can imagine would be the preservation of "sound districting principles," *UJO*, 430 U. S., at 168, such as compactness and contiguity. But as JUSTICE WHITE points out, see *ante*, at 672 (dissenting opinion), and as the Court acknowledges, see *ante*, at 647, we have held that such principles are not constitutionally required, with the consequence that their absence cannot justify the distinct constitutional regime put in place by the Court today. Since there is no justification for the departure here from the principles that continue to govern electoral districting cases generally in accordance with our prior decisions, I would not respond to the seeming egregiousness of the redistricting now before us by untethering the concept of racial gerrymander in such a case from the concept of harm exemplified by dilution. In the absence of an allegation of such harm, I would affirm the judgment of the District Court. I respectfully dissent.

---

ority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown* v. *Board of Education*, 347 U. S., at 494. As for representative democracy, I have difficulty seeing how it is threatened (indeed why it is not, rather, enhanced) by districts that are not even alleged to dilute anyone's vote.